Sanders & Walker v. Herndon.

---

CASE 45.—ACTION BY SANDERS & WALKER AGAINST WIL-
        LIAM HERNDON AND OTHERS TO DETERMINE
        THE LIABILITY OF THE PARTIES AS SURETIES
        ON A NOTE.—March 17.

## Sanders & Walker v. Herndon

Appeal from Garrard Circuit Court.

W. C. BELL, Circuit Judge.

From a judgment of dismissal plaintiffs appeal—
Reversed.

1.  Appeal—Mandate and Proceedings in Lower Court—Law of the
    Case.—The decision of the Court of Appeals on appeal is the
    law of the case on a subsequent trial, and the principles set-
    tled thereby are not open for reargument.
2.  Principal and Surety — Contribution Among Sureties. — Co-

securities will, on a surety paying in full the debt for the benefit of all the sureties, be indebted to him for their proportionate part of the debt.

3. Same—Actions Between Co-Sureties—Relief.—Where, in a proceeding under Civ. Code Prac. section 439, to subject the property of a surety to the satisfaction of a judgment for the debt, the petition alleged that plaintiff was a surety of the debtor, and that defendant was plaintiff's surety and was liable for the debt paid by plaintiff, and the evidence showed that plaintiff and defendant were sureties, and that plaintiff had paid the judgment, the court was required under the general prayer in the petition for proper and equitable relief to give judgment against defendant for his proportionate part of the debt.

4. Corporations—Defective Corporations—Liability of Promoters. —A corporation was organized with a capital stock of $100 to engage in the business of buying lands and boring oil wells. Thereafter the articles of incorporation were amended by increasing the capital stock to $60,000. None of the new stock was issued, and $8,220 was all that was subscribed and paid for. Some of the incorporators took an option on a farm. The corporation borrowed money to pay for the farm, and some of the incorporators indorsed the notes given for the money. Held, that the incorporators were liable as partners, the facts not showing a valid incorporation.

5. Equity—Bringing in New Parties.—In a suit under Civ. Code Prac. section 439, to subject the property of defendant to the payment of a judgment rendered on notes signed by an alleged corporation and defendant and plaintiff and others as sureties, based on the fact that plaintiff had satisfied the judgment, the court, with a view of settling the liabilities of the incorporators as partners because of the invalidity of the incorporation, should make all the incorporators parties.

6. Equity—Mutiplicity of Suits.—Equity abhors both circuity and mutiplicity of actions, and will adjust equities of persons in one suit.

LEWIS L. WALKER and J. W. ALCORN for appellants.

M. C. SAUFLEY, R. H. TOMLINSON, J. M. ROTHWELL C. B. SWIN7BROAD and WILLIAM HERNDON for appellees.

Sanders & Walker v. Herndon.

OPINION OF THE COURT BY JUDGE BARKER—Reversing:

This is the second appeal of this case to this court. The first opinion is to be found in 29 Ky. Law Rep. 322, 93 S. W. 14, 5 L. R. A. (N. S.) 1072. The former appeal was from a judgment of the trial court sustaining a general demurrer to the petition and dismissing it, upon the plaintiffs (appellants) declining to amend. This judgment was reversed, the opinion holding that the petition stated a good cause of action; and the case was sent back to the circuit court, with directions to overrule the demurrer, and for proceedings consistent with the opinion. It is hardly necessary to say that whatever principles of law were settled on the former appeal are now the law of this case, and not open to reargument. The appellants, Sanders and Walker, were, with seven other persons (among whom was the appellee William Herndon), sureties for the Lancaster Oil Company upon a note for $5,000, executed to the National Bank of Lancaster, Ky. When the note fell due it was not paid, and the bank brought suit on it against the principal and all the sureties, and obtained judgment against them for the sum of $5,000, with accrued interest and costs. In order to prevent an execution which isssued on this judgment from being levied on their property the appellants paid it off in full to the bank, and took an assignment of it to themselves, and then had an execution issued against all of the other sureties, which was returned "no property found" by the sheriff into whose hands it came for execution. Thereupon the appellants obtained a copy of the execution and return of the sheriff, and instituted this equit-

able action under the provisions of section 439 of the
Civil Code of Practice against the appellee Herndon
alone, and caused attachments to be issued against
certain money, which was either his, or in which he
had an interest. The petition, after setting forth in
detail the transaction out of which the litigation
springs, alleged that, while as to the bank the plain-
tiffs were sureties for the Lancaster Oil Company, as
to the appellee Herndon the appellants were his sure-
ties and he was their principal, and therefore bound
to them for the full amount of the debt which they
had been forced to pay for him. Upon the return of
the case to the circuit court the appellee filed an
answer denying that appellants were his sureties, and
alleging that all the parties to the note were co-sure-
ties for the principal, the Lancaster Oil Company.
The question whether or not appellants were the
sureties of William Herndon in reality, or whether
they were only his co-sureties on the note of the oil
company, was the main question left for determina-
tion after the case returned to the circuit court. Much
testimony was taken upon this issue, and upon the
final trial the court evidently held that the appellants
failed to establish the fact that they were the sureties
for appellee Herndon and therefore dismissed the
petition, and of this judgment the appellants are here
on appeal for the second time.

We are inclined to think the appellants failed to
establish, by a preponderance of the evidence, that
they were the sureties of Herndon, and that the court
correctly so adjudged; but it does not follow that
the petition should have been dismissed, because, on
the facts stated in the pleadings and not disputed by
either party, the appellants were, at least, the co-
sureties of appellee Herndon, and they having paid

off the judgment in full, certainly he was indebted to them for his proportionate part of the whole debt which they had paid for the benefit of all the sureties, and for this much, at least, the court should have given judgment in order to do complete justice between the parties under the general prayer of the petition for all proper and equitable relief. The failure of the court to do this will require a reversal of the judgment, and for procedure hereafter along the lines which we shall now set forth. The evidence in this case, without contradiction, shows the following facts as a part of the history which led up to the indebtedness which is the basis of this action; Wiliam Herndon and nine others, to wit, G. M. Patterson, J. B. Conn, J. I. White, R. G. Ward, J. J. Barton, J. B. Kinnaird, J. B. Sanders, Alex Walker, and William H. Kinnaird, apparently had caught the oil fever, and were anxious to acquire property in the oil region of Knox county, which at that time was experiencing what is commonly called a "boom." On the 7th day of March, 1902, Herndon and his co-promoters executed articles of incorporation under the provisions of the Kentucky Statutes by which they, in form, organized the Lancaster Oil Company with a capital stock of $100, which was represented by 30 shares of $3.33 each; each of the incorporators subscribing for three shares of stock. On the 24th day of March, 1902, the articles of incorporation were amended by increasing the capital stock to $30,000, divided into 3,000 shares of $10 each. On the 5th day of April, 1902, the articles of incorporation were again amended, increasing the capital stocq to $60,000, with shares at $5 each, and authorizing an indebtedness of $30,000. None of this increased stock was subscribed for, except as hereinafter stated.

On the 3d day of April, 1902, William Herndon, with two other incorporators, went to Knox county on business for the company, and while there took an option upon a farm owned by one Wages at the agreed price of $25,000; $500 being paid for the option, and the remaining $24,500 to be paid in 30 days from that date, or sooner, if the company accepted the deed. Herndon then returned to Lancaster, and the incorporators of the oil company held a meeting at his residence, and it was agreed that the company should purchase the property and accept the deed, which was afterwards done. A few days after this Alex Walker subscribed for $300 worth of the stock for his firm of Sanders & Walker, and paid for it with partnership money. Afterwards they subscribed for $2,200 more, which was also paid for with partnership money. And it was agreed that they were to have one-twelfth interest in the corporation under the amended articles. Of the new stock W. H. Kinnaird, one of the incorporators, subscribed and paid for $2,500 worth of the stock, and there were other scattering shares sold to various parties amounting in the aggregate to $1,120, so that of the increased capitalization of $60,000, $6,220 was the total amount subscribed for and paid in. In order to raise the $25,000 necessary for the purchase of the Wages oil farm, before mentioned, it was necessary to borrow, and the parties did borrow, $19,900, for which the notes of the company were executed with the incorporators, either all or the greater part of them, on each of the notes as sureties. These various notes were probably renewed from time to time; but finally "the bottom appears to have dropped out of the oil boom and it collapsed," and nothing further was done to perfect the incorporation of the Lancaster Oil Company un-

der the amended articles.  None of the new stock was ever issued, and, as said before, $6,220 was all that was ever subscribed or paid for.

The question which arises from the facts as above stated is, What are the relations of the parties to this transaction?  Are they to be treated as shareholders in a completed organization, or are they simply partners in a disastrous oil speculation?  It is clear that the original organization of the corporation with $100 capital stock was a mere tentative step in the organization of the corporation which was really contemplated, and was to be organized thereafter.  It would be absurd for a corporation to be organized with only $100 capital stock to engage in the business of buying lands and leases, boring wells, and constructing pipe lines; and, although these large powers were given by the words used in the articles of incorporation as they were originally prepared, it requires no argument to show that the parties were only tentatively organizing, and that, if they started into the oil business at all thereafter, the articles of incorporation were to be amended and the capital stock increased so as to make the venture, at least, feasible. The evidence shows that there was an oil well on the Wages farm called a "gusher," and it was the presence of this "gusher" which seems to have unduly excited the hopes of the incorporators of the miniature organization, and made them anxious to purchase the farm.  Pending the 30 days the testimony shows that another "gusher" was developed on the same farm, and it is not difficult to understand how the anxiety of the parties to acquire the farm before the option expired was increased by this opportune development.  It was no doubt believed that it was inexpedient to wait for the slow process of selling

the stock and raising the purchase money in this way.
It was therefore determined to go into bank and
borrow $19,900, pay for the farm before the option
expired, and then issue and sell new stock so as to
pay the notes held by the bank, when they fell due;
and undoubtedly, if the oil wells had continued to
flow in quantities commensurate with the hopes of
the would-be incorporators, this would have been of
comparatively easy accomplishment. But unfortu-
nately the wells failed, the excitement died out, and
any further sale of stock became impossible. As a
consequence, as said before, nothing further was done
in the organization under the amended articles. The
parties evidently accepted the inevitable loss that was
thus entailed upon them. The money borrowed is
represented by several notes for various amounts
held by different banks, the note involved in this liti-
gation being one of the number. All of the incorpo-
rators are not sureties on each of the notes, and it is
said that several of them are insolvent, one, at least,
is dead; and the question which arises on these facts
is how the financial relations of the parties in the
venture should be settled and adjusted.

It seems to us that the facts detailed above show
that there was never a valid incorporation at all, and
the miniature corporation, the capital stock of which
was only $100, ought not to be treated as a completed
organization; but the court should pass by the mere
form of incorporation and treat the first articles as
simply a step in the organization of the real corpora-
tion which was to be afterwards formed. The orig-
inal corporation was organized merely to have a name
and a legal entity in and by which to commence opera-
tions in the oil fields. If anything was done at all
beyond the mere organization of a corporation in

name, the articles were necessarily to be changed by increasing the capital stock to a figure which would give the venture, at least, the appearance of feasibility. Now here was a corporation organized by 10 men for the purpose of buying and selling oil lands and leases, boring oil wells, and building pipe lines— operations which would require thousands of dollars of capital—with a total capitalization of $100. The statute authorizing the organization of such corporations contemplates the creation of bona fide corporations, not the organization of mere sham and pretended corporations. The original corporation, with a paid up capital of $100, went into debt $19,000, for which it executed its notes with its incorporators as its sureties. To conclude, as we do, that the execution of the first articles was merely the beginning of a corporation, which was afterwards to be completed by organizing on a practical basis, is consonant with the real intention of the parties, and rescues the names of a number of honest, but unfortunate, men from the aspersion of being their own dupes, and seeking to work a fraud upon all others who could be sufficiently interested to invest in the enterprise they were promoting. The undisputed facts in this case show what part of the corporate stock each of the named incorporators was to take, and, having failed to go forward with the organization of the proposed corporation, they should be treated as partners, and the partnership should be settled in this action. In the case of Mt. Carmel Telephone Co. v. Mt. Carmel and Flemingsburg Telephone Co., 119 Ky. 461, 84 S. W. 515, we held that the subscribers for the stock of a proposed corporation, before they are incorporated, are partners in the business which they have in hand. The parties who were proposing to organize

the corporation in the case at bar have incurred an indebtedness of nearly $20,000, which is represented by notes of various amounts, some of which have been paid, and others not. Several of the incorporators have paid in the full amount of their subscriptions, appellants have paid more, while others have paid nothing; and a large part of them are indebted to their partners for their contributive shares of the debts already paid. That the conflicting rights of these parties may be brought into the same case and there adjusted is manifestly the only way in which their affairs growing out of this unfortunate and complicated venture can be equitably settled; otherwise the litigation will not only be multiplied, but will be perplexing and expensive in the extreme. It is elementary that equity abhors both circuity and multiplicity of actions, and the substantial interests of all the parties to the disastrous speculation we have under discussion requires that the affairs of the partnership (for such we deem it) should be settled, and the conflicting equities of the various partners should be adjusted after all the partnership debts are paid.

The judgment is therefore reversed, with directions that the appellants be allowed to amend their petition and bring the necessary parties before the court, and the case referred to the commissioner, so that the partnership affairs may be fully settled and adjusted, and for such other procedure as may be necessary and not inconsistent with this opinion.